## WOONSOCKET RUBBER Co. *v.* CANDEE and others.

*(Circuit Court, D. Connecticut.  May 19, 1885.)*

PATENTS FOR INVENTIONS—TAP FOR RUBBER BOOTS—NOVELTY.
   Patent No. 103,594, granted May 31, 1870, to Francis Flynn, for an improved
   tap for rubber boots, *held* void for want of patentable novelty.

In Equity.

*B. F. Thurston, Causten Browne,* and *Chas. E. Mitchell,* for com-
plainant.

*J. S. Beach* and *C. R. Ingersoll,* for defendant.

WALLACE, J.  The complainant's bill in this suit alleges infringe-
ment of the patent granted May 31, 1870, to Francis Flynn, assignor
of complainant, for an improved tap for rubber boots.  The answer
sets up that the alleged invention was known to and used by others
in this country prior to the invention of Flynn, and that there was
no invention in the improvement in view of the prior state of the art.

The patentee states in his specification that the improvement "con-
sists in the construction of the double sole or tap," which on the rub-
ber boots and shoes theretofore made "terminated abruptly where the
shank begins, which is objectionable, because in walking the greatest
strain comes directly across this point, so that after a few months'

wear the tap becomes started from the sole, making the boot useless." He proceeds:

"It is my object to remove this objectionable feature, which I accomplish by extending the tap, B, under the shank of the boot, A, and instead of narrowing the tap abruptly at the points, $b$, $b$, rounding gradually, narrowing it down to the point, $b^1$, as clearly shown in figure 2 of the drawing. The tap and main sole of the boot and shoe are united while in a plastic state, and then vulcanized together. By constructing the tap in this manner the strain brought upon it at the points, $b$, will be partly taken up by the extension and relieved to such an extent that it will be impossible to start off the tap; besides, it will make the boot just as serviceable as one with an entire double sole, though it can be made at less cost."

The claim is:

"A rubber tap sole for rubber boots, formed with a long and pointed shank, extending under the shank of the boot or shoe, said tap sole being fastened to the main sole by vulcanization, substantially as and for the purpose described."

If the invention thus claimed is an extra rubber sole of the form and fastened to the main sole as described, without regard to the thickness of the extra sole, want of novelty is established by the proofs. Soles of this form, and fastened to the main sole in the manner described in the specification, were made by the Hayward Rubber Company at Colchester, Connecticut, in 1865, and by the New Brunswick Rubber Company at New Brunswick, New Jersey, in 1866.

The fact is not disputed that shoes like the Exhibit Hayward German Shoe were made by the Hayward Rubber Company, in 1865, and the proofs show satisfactorily that shoes like the exhibits "New Brunswick, 1866," and "New Brunswick, 1860 to 1870," were made by the New Brunswick Rubber Company in 1866 and subsequently. The extra sole on the shoes of the first two of these exhibits is of the specific form of the tap sole of the patent, and that in the shoes of the last exhibit, although rounded under the shank instead of being brought to a sharp point as in the patent, is sufficiently pointed to perform the functions of the patented tap, and, for all practical purposes, is of the required form. The complainant insists, however, that these taps are not anticipations of the patented taps, because they are not of requisite thickness, and that nothing is a tap sole, within the meaning of the patent, which is not an extra sole having a definite degree of thickness, relatively, to the main sole. In the language of the complainant's counsel, "nothing is a tap sole, within the meaning of this patent, except an extra sole, which is so heavy or stiff, relatively, to the weight or stiffness of the main sole, that, if it terminate abruptly at or about the place where the shank begins, the bending strain produced by walking will be localized there by reason of the difference of pliability between the part covered by the extra sole and the shank of the boot or shoe." In the language of complainant's expert: "Whenever in a rubber boot a difference in the thickness of the sole is such as to tend to separate the tap or break the sole, then the extension of

the superimposed thickness on the sole to a point of rest under the shank is the invention of Flynn and covered by his patent."

There is nothing in the specification which, in terms or by inference, makes the thickness of the tap sole a constituent of the invention. It is there suggested that a tap is started from the main sole by the strain in walking, which comes across the place where. the main sole joins the shank, and that one of the advantages of the improvement is that the tap will make the boot as serviceable as one with an entire double sole. As the strain in walking may be affected by the thickness of the main sole, as well as by that of the tap sole, and as, in any event, the thickness of the tap will only effect a difference in degree, the first of these suggestions throws no light upon the point. The other is equally indecisive, because a double sole is only an extra sole, and if it gives additional wearing capacity to the boot, may be of any degree of thickness.

The essence of the invention is in the form or shape of the tap sole, by which the objections to the old tap sole are obviated. When it is ascertained what is meant by a tap sole, as that term is addressed to those skilled in the art to which the invention appertains, it only remains to consider whether, in other respects in form and mode of fastening, the anticipating article negatives the novelty of the invention. The expert for the complainant has given a satisfactory definition of the term "tap sole," and one which is supported by the testimony of other witnesses. He states, in substance, that while there are variations in thickness, absolutely or relatively to the main sole, the tap sole must always have "sufficient thickness to form a practical additional thickness to the main sole, which will endure practical wear and service," and "add to the wearing capacity of the main sole."

Applying this test to the exhibits introduced by the defendant, which have been referred to, they embody the tap sole of the patent. They are quite distinguishable from the "rough soles" cemented to the main sole, such as are shown by the exhibits known as "Carew's World's Fair." They are extra soles of sufficient thickness to impart a very sensible degree of stability to the main sole and add to the wearing capacity of the shoe. While these soles were adapted only to prevent slipping, that circumstance is not material, except to suggest a closer scrutiny of the articles in order to see if they really have features which were not designedly adopted. The exhibit "New Brunswick, 1860 to 1870," shows very clearly a practical extra sole of requisite thickness. The extra soles of the New Brunswick Rubber Company are as thick, absolutely and relatively to the main sole, as those shown in some of the boots of the complainant's manufacture, which are stamped by complainant as patented under the patent in suit. This circumstance is not controlling, but it is significant as tending to show the construction which the complainant, by its officers, has sometimes placed upon its own patent, and that the thin-

ness of the extra sole has not always been regarded by them as material.

As has been stated, there is nothing in the specification to indicate that the invention is for anything but a tap sole, without regard to thickness, absolutely or relatively, to the main sole. But the proofs show that the very thing the patentee designed to remedy—the tendency of the tap to start at the place where it joins the shank—was a defect in thin soles as well as in thick, and existed in the thin extra soles which were in use, before the, date of Flynn's improvement. These extra soles were no thicker than those of the "Hayward German Shoe" and the "New Brunswick, 1866," according to the testimony of complainant's witness Mr. Jaquith. Some were probably thinner. The invention was as applicable to those thin soles as to thick ones, though doubtless the defect to be remedied was more serious when thick soles were used.

Referring again to the statement of the complainant's expert that the invention is found "whenever the thickness of the sole is such as to tend to separate the tap or break the sole," (the form of the patent being adopted,) it follows that it is anticipated by the thin extra soles of the form and fastened to the main sole, as shown in the exhibits mentioned.

Finally, it may be said that, although Flynn's form is more advantageous when used in a thick extra sole than when it is used in a thin one, his improvement is one of degree only; and, in view of the fact that this form, as applied to thin extra soles, was old, the improvement is destitute of patentable novelty.

A decree is ordered for the defendant.